E-FILED
Tuesday, 24 September, 2019  05:07:38 PM
Clerk, U.S. District Court, ILCD

AO 106 (Rev. 04/10)  Application for a Search Warrant

FILED
SEP 24 2019
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**THE RESIDENCE LOCATED AT**<br>204 Winding Lane, Rantoul, Illinois 61832 | )<br>)<br>)<br>)   Case No. 19-MJ-**7198**<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, which is attached hereto and incorporated by reference.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of Controlled Substances (Cocaine and Cocaine Base) |

The application is based on these facts:
See DEA Task Force Officer Nick Krippel's attached affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/NICK KRIPPEL

_____
*Applicant's signature*

_____
DEA Task Force Officer Nick Krippel
*Printed name and title*

Sworn to before me and signed in my presence.

s/ERIC I. LONG

Date: __9/24/2019__

_____
*Judge's signature*

City and state: __Urbana, Illinois__

_____
United States Magistrate Judge Eric I. Long
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

IN THE MATTER OF THE SEARCH OF    Case No. 19 -mj - 7198
THE RESIDENCE LOCATED AT

204 Winding Lane, Rantoul, Illinois 61832    **Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Nick Krippel, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.     This affidavit is submitted in support of an application for a warrant to

search the entire premises located at 204 Winding Lane, Rantoul, Illinois 61832

(hereinafter "SUBJECT PREMISES"), a location more particularly described in

Attachment A. During this search, I seek to seize evidence, fruits, and instrumentalities

of violations of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), more

specifically described in Attachment B.

2.     I, Nick Krippel, am a Task Force Officer ("TFO") with the Drug

Enforcement Administration (DEA) and have been employed with the DEA since May

of 2018. I have been employed with the Champaign Police Department in Champaign,

Illinois for approximately 14 years. I have specialized training in various aspects of

narcotics investigations which include but are not limited to interviewing defendants,

surveillance techniques and money laundering. I have personally conducted or assisted

in numerous investigations of state and federal criminal violations involving the illegal

trafficking of narcotics and related crimes. I have helped prepare numerous criminal

1

affidavits, executed search warrants, and testified at criminal trials during my participation in investigations.   As a DEA TFO, I am authorized to investigate violations of the United States Code and to execute warrants issued under the authority of the United States.

3.      The information contained in this affidavit is based upon my personal knowledge of this investigation and upon information provided by other law enforcement personnel. As this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included all of the facts known to agents concerning this investigation. Rather, I have set forth only those facts I believe to be necessary to establish probable cause to believe that located within SUBJECT PREMISES, there is currently evidence, fruits, and instrumentalities of illegal trafficking in controlled substances and/or money laundering.

## PROBABLE CAUSE

### Confidential Source Information

4.      The Champaign Police Department Street Crimes Task Force ("CSCTF") began working with a Confidential Source (hereinafter "CS") in approximately July 2019. The CS is controlled by the Champaign Police Department and is working in exchange for consideration on charges in McLean County for the offenses of speeding, possession of a controlled substance (less than 5 grams), and possession of drug equipment.

5.      The CS has previous arrests for traffic offenses, dangerous drugs, and assault.  The CS has no previous convictions for any offense. The CS has previously

2

provided reliable information that has been proven accurate to the Champaign Police

Department relating to drug trafficking activity in the Champaign County, Illinois area.

As detailed below, in the present investigation, the CS conducted seven controlled

purchases in coordination with the Champaign Police Department Street Crimes Task

Force.

## Present Investigation

6.      In February of 2019, the DEA along with the Champaign Street Crimes

Task Force (CSCTF) initiated an investigation involving individuals named Marnetta

WALKER (WALKER) (DOB: 02/25/1986) and Jyshawn JACKSON (JACKSON) (DOB:

06/11/91). The CS involved in this investigation informed law enforcement officers that

WALKER was actively involved in the illegal distribution of cocaine and crack cocaine

in the Champaign and Rantoul, Illinois area. CS advised that WALKER works as a

middleman for a subject that the CS knows as "KG," whom agents identified as

JACKSON. The CS identified JACKSON by a Facebook photograph.  At the same time,

the CS provided telephone number 217-600-1840 as a contact number for WALKER.

Illinois Department of Corrections (IDOC) Parole Officer Mario Catarinicchia provided

a contact number for JACKSON of 217-721-2822.  IDOC Officer Catarinicchia advised

that 217-721-2822 is the telephone number that JACKSON will call him from to arrange

parole compliance checks.  A DEA Administrative Subpoena for telephone subscriber

information indicates telephone number 217-721-2822 is subscribed to "Jyshawn

JACKSON" at 117 Winding Lane, Rantoul, IL.  IDOC Parole Agent Catariniccihia

advised that 117 Winding Lane, Rantoul, IL, is JACKSON'S paroled address, however

he does not believe JACKSON to be residing at that residence.  In my training and

experience I know that often drug traffickers provide false addresses as law

enforcement to avoid detection of their criminal activities.  DEA Administrative

Subpoenas for the telephone numbers for WALKER and JACKSON were also cross

referenced to show contacts between the phone numbers.  This report showed contact

between WALKER and JACKSON's phone numbers during each of the seven

controlled purchases in the present investigation.

7.      In July of 2019, the DEA, in conjunction with the Champaign Street

Crimes Task Force ("CSCTF"), formulated a plan to conduct multiple controlled

purchases from JACKSON and WALKER utilizing the CS. Audio/video recording

devices were utilized during this operation.

### Controlled Purchase #1

8.      On July 18, 2019, at approximately 12:33 p.m., your affiant, DEA Task

Force Officer ("TFO") Nick Krippel, and DEA Task Force Officer ("TFO") Marshal

Henry met with the CS at a pre-arranged location, an anticipation of the purchase of

purported crack cocaine from WALKER.  The CS and CS's vehicle were searched for

contraband, with negative results.

9.      At approximately 11:05 a.m. on the same date, the CS sent a text message

to WALKER at the telephone number 217-600-1840, which stated "BDU in ten min

FuFu."  From my training and experience, I believe "BDU" to mean "be to you" and

"FuFu" is a nickname for WALKER.  CS then called the telephone number 217-600-1840.

During this call, he spoke to a subject who the CS recognized as WALKER and told WALKER he/she is three to five minutes away.

10.     At approximately 11:14 a.m., DEA TFO Krippel provided the CS with $500 SCTF Official Advanced Funds (OAF) and the covert audio/video recording equipment was activated. At approximately 11:14 a.m., the CS left this location, covertly followed by DEA TFO Henry and DEA SA Santoyo.  At approximately 11:15 a.m. Officer Quinley observed CS arrive and park in WALKER'S driveway at 601 W. Bloomington Road, Champaign, Champaign County, Illinois.  Officer Quinley observed the CS exit the CS vehicle and enter the residence.

11.     At approximately 11:31 a.m., the CS and WALKER exited the residence and entered the CS vehicle.  The CS then drove WALKER down the street to the Golden Hour convenient store.  WALKER exited the CS vehicle and entered the store.  At approximately 11:35 hours, WALKER exited the store and returned to the CS vehicle. The CS then drove back to the driveway at 601 West Bloomington Road.

12.     At approximately 11:36 hours, a red Pontiac sedan bearing IL registration #723238 arrived.   The vehicle is registered to Jyshawn JACKSON at 117 Winding Lane, Rantoul, Illinois, and was identified as a 2002 Pontiac coupe.  WALKER walked over to the Pontiac and got into the front passenger seat.  WALKER then exited the Pontiac and returned to the CS vehicle.  The CS then departed back to pre-arranged location.  A black male exited the Pontiac, and then the male and WALKER entered WALKER's residence.

13.     At approximately 11:38 a.m., agents arrived back to the pre-arranged location with the CS. The CS provided agents with a clear plastic baggie containing suspected crack cocaine. The CS and CS's vehicle were searched for contraband, with negative results. Moments later, agents debriefed the CS.

14.     The CS informed agents that the CS had arrived at WALKER'S residence and entered the house. WALKER had then called an unknown subject and told them that the money was there. The CS then gave WALKER a ride to Golden Hour so that she could obtain cigarettes. When the CS returned to WALKER'S residence, a red Pontiac arrived. The CS provided WALKER with the $500 USC/OAF. WALKER entered the red Pontiac and then returned to the driver window of the CS's vehicle. WALKER then handed the CS a bag containing suspected crack cocaine. A subject the CS knows as "KG" then exited the red Pontiac. WALKER and the subject that CS knows as "KG" then entered WALKER'S residence. The CS departed back to the prearranged location.

15.     TFO Krippel showed the CS a photograph of WALKER with identifiers hidden. The CS positively identified WALKER as the subject that handed him the crack cocaine. TFO Krippel also showed the CS a photograph of JACKSON with identifiers hidden. The CS positively identified JACKSON as the subject that the CS knows to be "KG" and who provided the crack cocaine to WALKER.

16.     On same date, TFO Krippel weighed and conducted a field test on the suspected crack cocaine. TFO Krippel discovered the suspected crack cocaine weighed

approximately 6.6 grams and field-tested positive for the presence of cocaine.  TFO

Krippel secured the suspected crack cocaine into CPD evidence.

### Controlled Purchase #2

17.     On July 25, 2019, at approximately 10:40 a.m., your affiant, DEA TFO Nick

Krippel, and DEA SA Martin Santoyo met with the CS at a pre-arranged location, in

anticipation of the purchase of purported crack cocaine from WALKER and JACKSON.

The CS and CS's vehicle were searched for contraband, with negative results.

18.     On same date, at approximately 10:48 p.m., the CS received a covertly

recorded telephone call from 217-600-1840, utilized by WALKER.  During the call, the

CS and WALKER arranged the price for another purchase of approximately one-quarter

ounce of cocaine and also made arrangements for a larger purchase of an ounce or more

of crack cocaine.  WALKER says that she will ask "him" about the price and call the CS

back.  A short time later, the CS received a second telephone call from WALKER.

During this telephone call, WALKER said, "Okay, he says if it positive that you will

come back Tuesday then he can do four."  CS responded, "I'm positive I can come

Tuesday, but I need to talk to him what is happening on Tuesday."  Walker said,

"Tuesday he says he gon' charge 1500."  CS said, "1500 for one full one, and he will

whip it." (I know from my training and experience that to "whip" means to cook

cocaine into crack cocaine.) WALKER said, "Yeah he did not have time to do it today."

The CS then confirmed that he/she would be there.

19.     TFO Krippel and SA Santoyo provided the CS with $400 SCTF USC/OAF

and activated the covert audio/video recording devices.  CS then drove from the pre-

arranged location to WALKER'S residence at 601 W. Bloomington Road, Champaign,
IL, while being under constant surveillance by agents.

20.     On the same date, at approximately 11:11 a.m., Officer Quinley observed
the CS arrive and park in WALKER'S driveway, then observed a black female
(confirmed via video/audio recordings to be WALKER) exit the residence and get into
CS vehicle.  At approximately 11:19 a.m., Officer Quinley observed a gray Buick bearing
IL registration #BN79116 arrive and also park in WALKER'S driveway near the CS
vehicle.  WALKER then exited the CS vehicle and walked over to the gray Buick.  At
approximately 11:21 a.m., Officer Kerner observed WALKER exit the Buick and reenter
the CS vehicle.  At approximately 11:22 a.m., Officer Kerner observed the gray Buick
depart.  At approximately 11:22 a.m., TFO Krippel observed the CS depart the residence
and return to the pre-arranged location.

21.     At approximately 11:24 a.m., agents arrived back to the pre-arranged
location with the CS. The CS provided agents with a clear plastic baggie containing
suspected cocaine. The CS and CS's vehicle were searched for contraband, with
negative results. Moments later, agents debriefed the CS.

22.     The CS told agents when he/she arrived at 601 W. Bloomington Road, the
CS sent a text message to WALKER to inform her he/she was in the driveway.
WALKER exited the residence entered the CS vehicle.  WALKER told the CS that "he"
is on the way.  After a brief conversation, CS provided $400 to WALKER.  The CS
advised WALKER then exited the CS vehicle and entered a gray BUICK, where she

remained briefly before reentering the CS vehicle to hand the CS a bag of suspected cocaine. After a brief conversation, the CS then drove back to pre-arranged location.

23. Following this second controlled purchase of suspected cocaine from WALKER and JACKSON, SCTF agents conducted surveillance on JACKSON'S gray Buick as it left 601 W. Bloomington Road. Agents ran a records check on the plate number BN79116 and discovered the vehicle was registered to Jyshawn JACKSON at 117 Winding Lane, Rantoul, IL. TFO Krippel and SA Santoyo caught up to the surveillance detail following the release of CS. TFO Krippel observed the Buick parked at the convenient store located at 904 N. Fourth Street, Champaign, Illinois, then saw JACKSON exit the vehicle and walk towards the convenient store.

24. On same date, TFO Krippel transported the suspected cocaine to the Champaign Police Department. The substance field-test tested positive for the presence of cocaine and weighed 7.6 grams, with packaging.

### Controlled Purchase #3

25. On July 31, 2019, the DEA and CSCTF formulated a plan to purchase one ounce and one quarter-ounce of suspected crack cocaine from WALKER and JACKSON. At approximately 10:45 a.m., your affiant, DEA TFO Nick Krippel, and DEA SA Martin Santoyo met with the CS at a pre-arranged location, an anticipation of another purchase of crack cocaine from WALKER and JACKSON. Prior to the purchase, the CS and CS's vehicle were searched for contraband, with negative results.

26.    At approximately 10:52 a.m., the CS placed a recorded telephone call to WALKER at the telephone number 217-600-1840. The CS told WALKER that he/she was about 5 or 10 minutes away. WALKER responded, "Yeah let me call him."

27.    TFO Krippel and SA Santoyo provided CS with $1800 DEA USC/OAF and the covert audio/video recording devices. CS then drove from the pre-arranged location to WALKER'S residence at 601 W. Bloomington Road, Champaign, Illinois, while being under constant surveillance by agents.

28.    On the same date, at approximately 11:03 a.m., Officer Quinley observed the CS vehicle arrive at 601 W Bloomington Road, Champaign, Ilinois. At approximately 11:33 a.m., Officer Quinley observed WALKER exit the residence and walk to the CS vehicle and have a conversation with CS. At approximately 11:38 a.m., Officer Quinley observed a silver Buick bearing IL registration BN79116 arrive at 601 W. Bloomington Road and park in the driveway. Officer Quinley observed WALKER get into the front passenger seat of the Buick. At approximately 11:39 a.m., Officer Quinley observed WALKER exit the gray Buick and return to the CS vehicle. TFO Krippel and SA Santoyo then followed the CS back to the pre-arranged location.

29.    At approximately 11:42 a.m., agents arrived back to the pre-arranged location with the CS. Agents retrieved the covert audio/video recording equipment from the CS and CS vehicle. The CS provided agents with a clear plastic baggie containing suspected cocaine and a clear bag containing suspected crack cocaine. The CS and CS's vehicle were searched for contraband, with negative results. Moments later, agents debriefed the CS.

30.     The CS told agents when he/she had arrived at 601 W. Bloomington Road, he/she spoke to WALKER on the telephone. WALKER asked the CS to take her to the store. CS advised WALKER that the CS was not going to take her to the store. WALKER then asked the CS to come into her residence. CS told WALKER that he had too much money and did not want to come into the residence. WALKER eventually left her residence and had a conversation with the CS at the driver side door of the CS vehicle. A silver Buick arrived and the CS provided $1800 to WALKER. WALKER then entered the silver Buick. One minute later, WALKER exited the silver Buick and walked to the open driver side window of the CS vehicle. WALKER placed the bags of suspected crack cocaine and suspected cocaine onto the CS's lap. The CS then weighed the suspected cocaine and crack cocaine and departed back to pre-arranged location.

31.     On the same date, agents maintained surveillance of JACKSON. Officer Quinley and Officer Kener used a recording device and observed JACKSON reposition his vehicle in the driveway at 601 West Bloomington Road. Officers then recorded JACKSON as he exited his vehicle and entered WALKER'S residence at 601 W. Bloomington Road, Champaign, Illinois.

32.     On same date, DEA SA Santoyo transported the suspected crack cocaine and powder cocaine to the DEA Springfield office, where SA Santoyo processed the exhibit. The purported crack-cocaine weighed approximately 6.07 grams, with packaging and field-tested positive for the presence of cocaine. The purported cocaine weighed approximately 27.93 grams, with packaging and field-tested positive for the

presence of cocaine. The exhibits is currently at the DEA North Central Laboratory,

with final laboratory analysis pending.

### Fourth Controlled Purchase

33.      On August 8, 2019, the DEA and CSCTF formulated a plan to purchase to

purchase one quarter ounce of suspected crack cocaine from WALKER and JACKSON

for $500 USC/OAF.  At approximately 3:52 p.m.., your affiant, DEA TFO Krippel, and

DEA SA Santoyo met with the CS at a pre-arranged location, an anticipation of the

purchase of a quarter ounce of crack cocaine from WALKER and JACKSON.  The CS

and CS's vehicle were searched for contraband, with negative results.

34.      At approximately 4:02 p.m., the CS received a telephone call from

WALKER at the telephone number 217-600-1840.  During the conversation, WALKER

directed the CS to meet her at the intersection of Sunset and Busey Streets in Urbana,

Illinois.  WALKER also told the CS that she already had the drugs because "he" had left

them with her.  It is believed based on prior purchases that the male being referenced

by WALKER was JACKSON. It should be noted that this telephone conversation was

not recorded.

35.      At approximately 4:07 p.m., the CS received another telephone call from

WALKER at the telephone number 217-600-1840.  During this telephone call, WALKER

told the CS to meet her in front of 1203 North Busey in Urbana, Illinois.

36.      At approximately 4:09 p.m., TFO Krippel and SA Santoyo followed the CS

to a new pre-arranged location.  At approximately 4:17 p.m., the CS was provided with

$500 DEA USC/OAF and the covert audio/video recording devices.  The CS then drove from the pre-arranged location to the area of 1203 N. Busey, Urbana, IL, while being kept under constant surveillance by agents.

37.     On the same date, at approximately 4:19 p.m., TFO Henry observed the CS arrive and park in front of 1203 N. Busey, Urbana, Illinois.  TFO Henry observed the CS temporarily move south out of the view of surveillance units.  At approximately 4:23 p.m., TFO Krippel and SA Santoyo observed the CS driving north on Busey from the area of 1203 N. Busey.  SA Santoyo and TFO Krippel follow CS back to pre-arranged location.

38.     At approximately 4:23 p.m., agents arrived back to the pre-arranged location with the CS.  Agents retrieved the covert audio/video recording equipment from the CS and CS vehicle.  The CS provided agents with a clear bag containing suspected crack cocaine. The CS and CS's vehicle were searched for contraband, with negative results. Moments later, agents debriefed the CS.

39.     The CS told agents that the CS had arrived at 1203 N. Busey in Urbana, Illinois, and had parked in the street.  The CS observed WALKER exit from the unit to the south of 1203 N. Busey, then enter the CS vehicle.  The CS provided WALKER with $400; WALKER asked for the other $100.  The CS told WALKER that she is taxing him, but then provided WALKER with an additional $100.  WALKER pulled the suspected crack cocaine from her pants and handed it to CS.  CS and WALKER then had a conversation about a bigger purchase.

40.     On same date, DEA SA Santoyo transported the suspected crack cocaine to the DEA Springfield office, where SA Santoyo processed the exhibit. The exhibit weighed approximately 4.53 grams, with packaging and field-tested positive for the presence of cocaine. The exhibit is currently at the DEA North Central Laboratory, with final laboratory analysis pending.

### Fifth Controlled Purchase

41.     On August 15, 2019, the DEA SRO and the CSCTF formulated a plan to purchase one ounce and one quarter-ounce of crack cocaine from WALKER and JACKSON for $1800 DEA USC/OAF.  At approximately 10:38 a.m., your affiant, DEA TFO Krippel, and DEA SA Santoyo met with the CS at a pre-arranged location, an anticipation of the purchase of crack cocaine from WALKER and JACKSON.  The CS and CS's vehicle were searched for contraband, with negative results.

42.     At approximately 10:41 a.m., the CS placed a recorded call to WALKER at the telephone number 217-600-1840.  During the conversation, WALKER told the CS that she will call "him" and to meet her at the same spot.  Based on the context of the conversation and the prior purchases, it is believed the male being referenced was JACKSON.

43.     At approximately 10:57 a.m., the CS was provided with $1800 DEA USC/OAF and the covert audio/video recording devices.  The CS then drove from the pre-arranged location to the area of 1203 N. Busey, Urbana, Illinois, while being kept under constant surveillance by agents.

44.    On the same date, at approximately 11:02 a.m., Sgt. Griffet observed the CS park on the side of the road on North Busey Avenue.  A short time later, Sgt. Griffet observed a female (later identified through reviewing the video/audio recording to be WALKER) enter the CS vehicle.   Sgt. Griffet maintained aerial surveillance of the CS as he/she traveled to and parked in the parking lot of a convenient store located at 904 North Fourth Street. Champaign, Illinois.   Sgt. Griffet observed WALKER exit the CS vehicle and enter the convenient store.  A short time later, Sgt. Griffet observed WALKER exit the store and reenter the CS' vehicle. At approximately 11:15 a.m., Sgt. Griffet observed WALKER exit CS vehicle, walk to a maroon Jeep Cherokee, and enter the backseat.  The driver of the Jeep Cherokee was not visible to surveilling officers.  At approximately 11:18 a.m., Sgt. Griffet observed WALKER exit the maroon Jeep Cherokee and reenter the CS vehicle.  At approximately 11:19 a.m., Sgt. Griffet observed the CS vehicle drive up to the maroon Jeep Cherokee.  At approximately 11:21 a.m., Sgt. Griffet observed WALKER again exit the CS vehicle to enter the Jeep Cherokee, before returning to the CS vehicle yet again.   A short time later, Sgt. Griffet advised that both vehicles were departing.  At approximately 11:25 a.m., Officer Carpenter advised that the Illinois registration plate on the Jeep Cherokee was #BP92453.  SCTF officers, along with Sgt. Griffet, maintained ground and aerial surveillance of the Jeep Cherokee as it traveled to Rantoul, Illinois.  TFO Henry, TFO Krippel, and SA Santoyo maintained surveillance of the CS.

45.    At approximately 11:50 a.m., Officer Quinley observed the Jeep Cherokee park in the driveway at 204 Winding Lane, Rantoul, Illinois.   At approximately 11:52

a.m., Sgt. Griffet observed a black male (later identified by the CS as the subject he

knows as "KG" and identified by agents as JACKSON) exit the residence at 204

Winding Lane, Rantoul, IL, and get into the front passenger seat of the Jeep Cherokee.

Sgt. Griffet maintained surveillance of the Jeep as it traveled back to the Circle K at 1501

N. Lincoln, Urbana, Illinois.

46.    Prior to arriving at the Circle K, the Jeep Cherokee – with JACKSON in the

passenger seat – pulled to the side of the road near a parked white Chevrolet Tahoe.

The driver of the Tahoe (unidentified by investigators) exited the Tahoe and

approached the Jeep's driver's window. After approximately one minute, the Jeep

departed the area and proceeded to the Circle K.

47.    At approximately 12:07 p.m., TFO Henry observed the CS vehicle depart

from 904 North Fourth Street and travel to the Circle K located at 1501 N. Lincoln,

Urbana, Illinois.  At approximately 12:17 pm, TFO Krippel observed the Jeep Cherokee

pull into the parking lot of the Circle K and park near CS vehicle.  TFO Krippel

observed WALKER exit the CS vehicle, walk over to the Jeep, and meet with JACKSON.

At approximately 12:19 p.m., Sgt. Griffet observed WALKER reenter the CS vehicle,

while the Jeep departed northbound on Lincoln Avenue.  At approximately 12:20 p.m.,

TFO Krippel followed the CS vehicle to the 1100 block of N. Busey Avenue, where

WALKER exited the CS vehicle.  At approximately 12:23 p.m., TFO Krippel and SA

Santoyo returned to the pre-arranged location with CS.

48.    At approximately 12:23 p.m.., agents arrived back to the pre-arranged

location with the CS.  Agents retrieved the covert audio/video recording equipment

from the CS and CS vehicle.  The CS provided agents with two clear bags containing

suspected crack cocaine. The CS and CS's vehicle were searched for contraband, with

negative results. Moments later, agents debriefed the CS.

49.     CS told agents that the CS had picked up WALKER on Busey Avenue.

WALKER directed the CS to Town and County Apartments.  As they were driving to

Town and Country, WALKER redirected CS to the convenient store on Fourth Street.

CS drove to the convenient store on Fourth Street and parked in the parking lot.

WALKER got out of the vehicle and went into the store. WALKER returned from the

store and got into the CS vehicle.  When a red Jeep arrived, Walker entered the Jeep for

a brief period then reentered the CS vehicle with one ounce of crack cocaine.  The CS

weighed the crack cocaine and discovered it to be approximately one ounce.  The CS

told WALKER to return the crack cocaine to "him" (meaning JACKSON) as it is "short"

(meaning the weight was too low).  WALKER returned to the Jeep, then reentered the

CS vehicle with the same one ounce of crack cocaine.  WALKER gave the ounce of crack

cocaine back to the CS and told the CS that "he" can go get the other quarter ounce.

Based on the context of the conversation and the prior purchases, it is believed that the

male being referenced was JACKSON.

50.     WALKER then took the $1500 to the red Jeep.  The Jeep pulled up near the

CS, and JACKSON (known to CS as "KG") told the CS that he will go get the other

quarter ounce of crack cocaine.  The CS then took WALKER to Grammercy Apartments,

so she could pick up an application.   The CS believed the cocaine would be delivered

back at 904 N. Fourth Street, so he drove to the convenient store to wait for the Jeep.

WALKER received a call from JACKSON, who told her to go to the Circle K on Lincoln

Avenue. The CS traveled to the Circle K and parked in the lot. "KG" then arrived back

in the Jeep. The CS gave WALKER $300, who took it to JACKSON at the Jeep, before

she returned to the CS vehicle. WALKER then handed the CS an additional one

quarter ounce of crack cocaine, which she pulled from her bra/chest area. The CS then

dropped WALKER back off on North Busey.

51.     On same date, DEA SA Santoyo transported the suspected crack cocaine

to the DEA Springfield office, where SA Santoyo processed the exhibit. One clear plastic

baggie weighed approximately 26.95 grams, with packaging and field-tested positive

for the presence of cocaine. The second clear plastic baggie weighed approximately 7.87

grams, with packaging and field-tested positive for the presence of cocaine. The exhibit

is currently at the DEA North Central Laboratory, with final laboratory analysis

pending.

52.     On the same date, agents maintained surveillance of the red Jeep after it

left the Circle K. Agents followed the Jeep back to Rantoul, IL. At approximately 12:40

p.m., Officer Quinley observed the Jeep park in the driveway at 204 Winding Lane,

Rantoul, Illinois, and observed JACKSON exit the Jeep and enter the residence.

### Sixth Controlled Purchase

53.     On September 5, 2019, the DEA and CSCTF formulated a plan to

purchase another quarter ounce of suspected crack cocaine from WALKER and

JACKSON for $500 DEA USC/OAF. At approximately 11:17 a.m., your affiant, DEA

TFO Krippel, and DEA SA Santoyo met with the CS at a pre-arranged location, in

anticipation of the purchase.  The CS and CS's vehicle were searched for contraband, with negative results.

54.    On the same date, at approximately 11:10 a.m., Officer Quinley was conducting surveillance at 204 Winding Lane, Rantoul, Illinois.  Officer Quinley observed JACKSON exit the residence and get into the front passenger seat of a red Jeep.

55.    At approximately 11:24 a.m., the CS placed a recorded call to WALKER at the telephone number 217-600-1840.  During this conversation, WALKER told the CS to meet her at the same spot.  The CS asked WALKER if "he" will be ready and WALKER replies that "he" should be.  From the context of the conversation and the events of the prior purchases, the male being reference is believed to be JACKSON.

56.    At approximately 11:43 a.m., the CS was provided with $500 DEA USC/OAF and the covert audio/video recording devices.  The CS then drove from the pre-arranged location to the area of 1203 N. Busey, Urbana, Illinois, while under constant surveillance by agents.

57.    On the same date, at approximately 11:46 a.m., TFO Krippel observed the CS pull up to the area near 1203 N. Busey and a black female (later identified as WALKER after reviewing the covert audio/video recordings) entered the CS vehicle.  The CS was then kept under constant surveillance as he traveled to Illini Convenience (located at 808 East Main Street, Urbana, IL).

58.    At approximately 11:59 a.m., Deputy Malloch observed a red Jeep Cherokee with Illinois registration #BP92543 (the same vehicle used in the August 15,

2019, controlled purchase) pull into the parking lot of Illini Convenience and park near CS. Deputy Malloch observed WALKER exit the CS vehicle and get into the back passenger seat of the Jeep. Deputy Malloch then observed WALKER exit the Jeep and walk to CS vehicle. WALKER then returned to the passenger side of the Jeep. At approximately 12:04 p.m., Deputy Malloch observed the Jeep and the CS vehicle to exit the parking lot.

59.     At approximately 12:08 p.m., TFO Krippel had followed the CS vehicle back to the area of 1203 N. Busey, where WALKER exited the vehicle. CS then departed to travel back to the pre-arranged location.

60.     At approximately 12:12 p.m., agents arrived back to the pre-arranged location to meet with the CS. Agents retrieved the covert audio/video recording equipment from CS and CS vehicle. The CS provided agents with one clear bag containing suspected crack cocaine. The CS and CS's vehicle were searched for contraband, with negative results. Moments later, agents debriefed the CS.

61.     The CS told agents that he/she had picked up WALKER; once inside the CS vehicle, WALKER called "him" (believed to be JACKSON). During the telephone call "he" directed WALKER to the Illini Convenient Store. The CS arrived and parked in the parking lot. A short time later, a Jeep pulled up near the CS. The CS identified the passenger as the subject that the CS knows as "KG" and is the same individual that provided the cocaine to WALKER on all previous transactions.  The CS provided WALKER with $500 US currency. WALKER got into the red Jeep, then returned to the

CS' vehicle, where she provided CS with the suspected crack cocaine. The CS was parked one spot away from "KG" and the two had a brief conversation about KG coming to the area where the CS resides. The CS then departed and dropped WALKER back off in the area of 1203 N. Busey.

62.     On same date, DEA SA Santoyo transported the suspected crack cocaine to the DEA Springfield office, where SA Santoyo processed the exhibit. The exhibit weighed approximately 7.12 grams, with packaging and field-tested positive for the presence of cocaine. The exhibit is currently at the DEA North Central Laboratory, with final laboratory analysis pending.

### Additional Investigation

62.     On Monday, September 23, 2019, TFO Krippel went to the City of Rantoul Police Department and spoke with their records division in reference to the utilities at 204 Winding Lane, Rantoul, Illinois, seeking to determine in whose name the utilities are registered. TFO Krippel learned that the utilities are registered to Darryl Nelson. TFO Krippel is familiar with Nelson from prior investigations, as he is known drug distributor. Nelson was the target of drug investigation by Rantoul Police in 2014 and the target of a drug investigation by the Champaign Street Crimes Task Force in 2018.

63.     Based upon my training and experience in investigating illegal drug trafficking organizations, my discussions with other law enforcement agents with additional experience, information learned through discussions with drug traffickers and others during investigative interviews, and my participation in the execution of other search warrants, I am familiar with common methods and procedures used by

drug traffickers, including the storage and maintenance of narcotics and money.

Through the above, I am aware that:

    a. Persons and organizations often use multiple locations besides or in addition to their personal residence as "stash houses" to discreetly conceal their illegal drugs, drug proceeds (including USC/OAF used during controlled purchases) and their whereabouts. By using "stash houses" the dealer minimizes his chances of being detected by Law Enforcement or robbed of drug proceeds or illegal drugs by rival drug dealers. Personas involved in drug trafficking prefer to keep their drugs in close proximity to them so that they are quickly accessible to sell once a person contacts them to purchase the illegal narcotics.

    a. Persons and organizations illegally trafficking in controlled substances generally have large amounts of currency on hand in a location to which they have ready access and which they believe to be secure, since the illegal nature of drug transactions causes them to almost always be conducted in cash.

    b. Persons and organizations trafficking illegally in controlled substances usually maintain books, receipts, notes, ledgers, or other forms of records relating to the ordering, purchase, receipt sale, or distribution of controlled substances. Drug traffickers commonly obtain and/or distribute controlled substance on a "front" (consignment) basis, and must keep track of money owed by and to them. Records of those and other transactions are typically maintained in locations to which the drug traffickers have ready access and which they believe to be secure.

c.  The large amount of currency involved in and derived from illegal drug

trafficking commonly leads to a variety of financial transactions relating to

obtaining, transferring, depositing, withdrawing, converting, or storing large

amounts of currency, and spending large sums of money in cash and other

forms. It is common for drug traffickers to maintain records, receipts, and other

evidence of such expenditures and financial activities, including such items such

as jewelry, precious gems, safe deposit box keys, and money wrappers, as well as

invoices, sales receipts, receipts relating to the purchase of financial instruments

and the transfer of funds, records of real estate transactions, statements of

account, deposit slips, money orders and cashier's checks and related receipts,

canceled checks, check registers, other records from financial institutions,

ledgers, financial statements, stock certificates, bonds, other financial

instruments, credit card records, and similar receipts and records.

d.  Because large expenditures of cash by someone with no apparent legitimate

source for that much currency can arouse suspicions and lead to reports to and

investigations by law enforcement agencies, drug traffickers commonly engage

in various financial transactions designed to disguise the source of their drug

money or to convert it into some apparently legitimate asset or form of income

so it can be spent or transferred without attracting the attention of law

enforcement authorities, which is commonly referred to as "money laundering."

Records of such financial transactions are typically retained by the traffickers and

include invoices, sales receipts, receipts relating to the purchase of financial

instruments and the transfer of funds, records of real estate transactions, statements of account deposit slips, money orders and cashier's checks and related receipts, canceled checks, check registers, other records from financial institutions, ledgers, financial statements, stock certificates, bonds, other financial instruments, credit card records, and similar receipts and records.

e.  As part of such money laundering activities, illegal drug traffickers often purchase and/or title their assets in fictitious names or aliases, or in the names of relatives, associates, or business entities to avoid detection of those assets and their true ownership by the government and law enforcement agencies, Even though such assets are in names other than the drug traffickers actually own and continue to use these assets, and exercise dominion and control over them. Therefore, the records and receipts described above are often in the names of nominees.

f.  Persons and organizations illegally trafficking in controlled substances usually maintain books, notes, or other records containing personal notations of names, addresses, and/or telephone numbers of their drug customers, suppliers, distributors, couriers, and other criminal associates.

g.  Persons involved in illegal drug trafficking very often travel to other locations to meet with suppliers, other drug distributors, associates, or customers, and subsequently retain records of that travel such as receipts for expenditures such as the purchase of fuel at service stations or meals, copies of tickets or receipts for

public transportation, transportation or travel schedules, car rental agreements
and receipts, and other notes.

h.  Persons involved in illegal drug trafficking often take or keep photographs of
their drug associates, property, or drug product. Those photographs are usually
maintained at their residences or places of drug business.

i.  Persons involved in illegal drug trafficking usually maintained the substantial
amounts of currency, other assets, and various types of records described above
in secure locations to which they have ready access and over which they have
control, directly or through others, such as their homes.

### CONCLUSION

63.      Based on the foregoing, I respectfully submit there is probable cause to
believe that WALKER and JACKSON have violated and is continuing to violate Title 21,
United States Code, Section 841(a)(1) and 846.  Additionally, I believe the foregoing
provides probable cause to believe that the property, evidence, fruits, and
instrumentalities of these offenses, including the OAF moneys provided to JACKSON
and other items more fully described in Attachment B of this affidavit, are located at the
SUBJECT PREMISES, a location more particularly described in Attachment A.
Therefore, I respectfully request that this Court issue a search warrant for the SUBJECT
PREMISES, authorizing the search for and seizure of items described in Attachment B.

64.    Because this investigation is ongoing and its success would be jeopardized if its contents of this Affidavit were made public at this time, I am requesting that this Affidavit and the accompanying Search Warrant documents be sealed until further Court Order.

Further, affiant sayeth not.

Respectfully submitted,

s/NICK KRIPPEL

Task Force Officer Nick Krippel
Drug Enforcement Administration

Sworn and subscribed before me on this _29th_ day of September, 2019.

s/ERIC I. LONG

ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### *Property to Be Searched*

The SUBJECT PREMISES is described as a blue in color single family residence with the numbers "204" affixed to the front of the residence, located at 204 Winding Lane, Rantoul, Illinois. The SUBJECT PREMISES also has an approximate Global Positioning System (GPS) coordinates of 40.311194203298, -88.1380190605343 and is located in the Central District of Illinois. The SUBJECT PREMISES includes the residential dwelling and any garage or grounds of the property.



*Photograph of 204 Winding Lane, Rantoul, Illinois.*

## ATTACHMENT B

### *Items to be Searched and Seized*

1.      Items that constitute or contain evidence, instrumentalities, or fruits of violations of Title 21, United States Code, Section 841 (Distribution of Controlled Substances), and violations of Title 18, United States Code, Section 1957 (Money Laundering), including:

a.      Illegal controlled substances;

b.      Substantial amounts of currency; possibly contained in safes, lock-boxes or other security containers;

c.      Books, receipts, notes, ledgers, cellular telephones, computer or electronic organizer files, or other records in any form evidencing the ordering, purchase, receipt, sale, or distribution of controlled substances and/or currency collected from controlled substance transactions, including present or past debts owed to or from other persons;

d.      Financial records and other items relating to obtaining, transferring, depositing, withdrawing, converting, or storing large amounts of currency, or spending large sums of money in cash or other forms, including, but not limited to, such items and records as jewelry, precious gems, safe deposit box keys, money wrappers, invoices, sales receipts, receipts relating to the purchase of financial instruments and the transfer of funds, records of real estate transactions, statements of account, deposit slips, money orders and cashier's checks and related receipts,

canceled checks, check registers, passbooks, other records from financial institutions, ledgers, financial statements, stock certificates, bonds, other financial instruments, credit card records, and vehicle titles;

e.  Books, notes, or other records containing personal notations of names, addresses, telephone numbers, currency notations, insurance information or other information related to the distribution of controlled substances or monetary transactions;

f.  Tickets, car rental receipts, schedules, notes, or other records evidencing travel outside the immediate municipal area;

g.  Photographs of other persons, property, currency or controlled substances constituting evidence of associations between persons participating in controlled substance trafficking;

h.  Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and,

i.  Telephone records, bills and receipts of purchase;

j.  Computers, computer hardware or software, computer printers, computer storage devices, computer peripheral devices that allow users to enter or retrieve data from storage devices, all magnetic storage devices as well as the central processing unit (CPU);

k.  Cellular telephones and cellular telephone content;

l.      Firearms and ammunition; and

m.      Paraphernalia for weighing, diluting, packaging, and distributing illegal controlled substances including, but not limited to, scales, plastic bags with missing corners, grinders, sifters, and diluting agents.